**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHRISTINA SULLIVAN, a single
person,
              *Plaintiff-Appellant,*

              v.

DOLLAR TREE STORES, INC., a
Virginia corporation, doing
business in Washington,
              *Defendant-Appellee.*

No. 08-35413

D.C. No.
2:07-CV-05020-EFS

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Edward F. Shea, District Judge, Presiding

Argued and Submitted
July 14, 2010—Seattle, Washington

Filed September 27, 2010

Before: Stephen Reinhardt, Susan P. Graber, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Graber

**COUNSEL**

Janet E. Taylor, Taylor Galloway, PLLC, Richland, Washington, for the plaintiff-appellant.

Leslie R. Weatherhead, Witherspoon, Kelley, Davenport & Toole, PS, Spokane, Washington, for the defendant-appellee.

**OPINION**

GRABER, Circuit Judge:

When is a new employer a "successor in interest" to a former employer under the Family and Medical Leave Act of

1993 ("FMLA"), 29 U.S.C. §§ 2601-2654? The answer matters because an employee is not eligible for the protections of the FMLA until he or she has worked for a particular employer for at least 12 months, and the term "employer" "includes . . . any successor in interest of an employer." 29 U.S.C. § 2611(4)(A)(ii). Today we adopt the persuasive reasoning of *Grace v. USCAR*, 521 F.3d 655 (6th Cir. 2008), and apply the regulations promulgated by the United States Department of Labor ("DOL") at 29 C.F.R. § 825.107. After doing so, we conclude that Plaintiff Christina Sullivan is not entitled to FMLA benefits because her new employer, Defendant Dollar Tree Stores, Inc. ("Dollar Tree"), for whom she worked for less than 12 months, is not a successor in interest of her former employer, Factory 2-U. Accordingly, we affirm the summary judgment in Dollar Tree's favor.

## FACTUAL AND PROCEDURAL HISTORY

Factory 2-U was a retail store that sold discount clothing. At its height, Factory 2-U operated more than 200 stores in the western United States and employed more than 4,000 people. Seven stores were located in the Tri-Cities area of southeastern Washington (Kennewick, Richland, and Pasco), and each of those stores had about 30 employees. Plaintiff Christina Sullivan was the full-time Store Manager of the Pasco Factory 2-U store.

By 2004, however, Factory 2-U had filed for Chapter 11 bankruptcy. In September 2004, the bankruptcy court approved the sale of Factory 2-U's existing leasehold on the Pasco store (and 39 other store leaseholds) to Dollar Tree. Dollar Tree is a chain retail store that sells a variety of items, including clothing, for one dollar. Apart from the leaseholds, Dollar Tree purchased no other assets of Factory 2-U. Others purchased the remainder of Factory 2-U's assets. At the end of September 2004, the Factory 2-U store in Pasco closed its doors.

Dollar Tree opened for business at the Pasco location four weeks later. During those four weeks, Dollar Tree reconfigured the store. First, a construction crew remodeled the interior to support a Dollar Tree store, in accordance with Dollar Tree's specifications. Second, a set-up team prepared the inventory, stocked the shelves with Dollar Tree's merchandise, and performed other preparatory work. Finally, on October 30, 2004, Dollar Tree opened for business in the former location of Factory 2-U, with 15 to 25 Dollar Tree employees.

In September 2004, Plaintiff filled out an application for employment with Dollar Tree. Dollar Tree hired her as an assistant manager of the soon-to-be-opened Dollar Tree store at the same Pasco location. Even though the store was closed for four weeks, Plaintiff's employment was continuous. During the first two weeks of the renovations in Pasco, Plaintiff trained at a pre-existing Dollar Tree store in nearby Richland. After her two-week training, Plaintiff then assisted with the preparatory work at the Pasco store. When the Pasco store opened, Plaintiff began full-time work at that store as an assistant manager. Only one other former Factory 2-U employee worked at the new Dollar Tree store in Pasco after its opening.[1]

From September 2004 until May 2005, Plaintiff worked as assistant manager at the Pasco Dollar Tree without incident. In May 2005, Plaintiff's mother experienced serious health problems, and Plaintiff provided assistance and care for her. Dollar Tree granted Plaintiff some amount of unpaid leave but

---

[1]Plaintiff originally submitted an affidavit attesting that "most" employees continued to work at Dollar Tree. Dollar Tree countered with a detailed affidavit describing who worked at the Pasco store, when, and for what purpose. Plaintiff declined to reply to Dollar Tree's specific factual assertions, resting on her original assertion of "most" employees. As we discuss in Part A-2, below, we agree with the district court that, in this context, Plaintiff's assertion does not meet the requirement in Federal Rule of Civil Procedure 56(e)(2) that a party set out "specific facts."

less than Plaintiff requested. Plaintiff either quit or was fired in late May or June 2005.

Plaintiff eventually contacted the DOL, which initiated an investigation of whether Dollar Tree had violated the FMLA. The DOL concluded that Dollar Tree's actions had violated the FMLA and informed the parties of its conclusion. During the negotiations that followed, Dollar Tree offered Plaintiff reinstatement to her former position at the Pasco store, a partial payment of $5,000 toward lost wages, and certain other benefits such as accrued sick leave. Although Plaintiff had sought more than $20,000 in lost wages, she accepted the offer[2] and began work again on April 14, 2006.

After her reinstatement, Plaintiff continued working at the Pasco Dollar Tree store until she quit voluntarily in December 2006. Soon thereafter, Plaintiff filed this action in federal court seeking the full amount of her lost wages. The district court held that Dollar Tree was not a successor in interest under the FMLA and granted summary judgment to Dollar Tree. Plaintiff timely appeals.

### STANDARDS OF REVIEW

We review de novo both a grant of summary judgment in general, *Sharer v. Oregon*, 581 F.3d 1176, 1177 (9th Cir. 2009), and pure questions of law decided on summary judgment, *Bjustrom v. Trust One Mortg. Corp.*, 322 F.3d 1201, 1205 (9th Cir. 2003). "Whether the district court correctly construed the hearsay rule is a question of law reviewed *de novo*. We review the admission of evidence under an exception to the hearsay rule for abuse of discretion." *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1217 (9th Cir. 2001) (citation and internal quotation marks omitted).

---

[2]Dollar Tree does not argue here that the settlement bars Plaintiff's claims.

DISCUSSION

### A.  *Preliminary Questions*

Plaintiff submitted many documents in support of her case, two of which are relevant here. First, Plaintiff submitted a report prepared by the DOL during or after its investigation of Plaintiff's complaints ("DOL Report"). Second, she submitted her own affidavit. Plaintiff argues that the district court erred by disregarding certain statements in the two documents.[3]

### 1.  *DOL Report*

**[1]** Plaintiff argues that the district court erred when it held that the DOL Report was inadmissible hearsay not exempted by Federal Rule of Evidence 803(8)(C), which provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> **(8) Public records and reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . (C) in civil actions and proceedings . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of infor-

---

[3]Plaintiff also asserts summarily that the district court erred by disregarding "several admissions" made by Dollar Tree, as revealed by the DOL Report and other documents. Plaintiff does not specify what facts she believes Dollar Tree "admitted." We deem this argument waived. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief. We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim . . . ." (citation omitted)).

mation or other circumstances indicate lack of trust-worthiness.

The disputed portion of the DOL Report states:

> Dollar Tree Stores, Inc., a covered employer, is considered a "successor in interest" to the covered employer Factory 2-U Stores, Inc. The circumstances of the transition that occurred between the two companies coincide with six out of eight factors that determine a "successor in interest." These factors are: 1) the same retail business operation continued; 2) the same rental space was used; 3) most of the same personnel continued to work; 4) the store continued to employ retail salespeople who worked during regular hours; 5) the same supervisory personnel continued with the opening of the Dollar Tree store; and 6) the products continued to include clothing along with other personal, gift and household items (Exhibit E-6).

### a.  *Legal Conclusions as "Factual Findings"*

**[2]** Some portions of the DOL Report, including the first sentence in particular, state legal conclusions. The district court ruled that, because Rule 803(8)(C) applies to "factual findings," legal conclusions are inadmissible. This seemingly straightforward holding uncovers an open question of law in this circuit: Does Rule 803(8)(C) cover an investigative report's *legal conclusions* as well as its *factual findings*?

In *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988), the Supreme Court rejected the argument that the term "factual findings" in Rule 803(8)(C) encompassed only "facts" and not "opinions" and "conclusions." The Court held that "factually based conclusions or opinions are not on that account excluded from the scope of Rule 803(8)(C)." *Id.* at 162. Particularly relevant here, the Court cabined its decision:

We emphasize that the issue in this litigation is whether Rule 803(8)(C) recognizes any difference between statements of "fact" and "opinion." There is no question here of any distinction between "fact" and "law." We thus express no opinion on whether legal conclusions contained in an official report are admissible as "findings of fact" under Rule 803(8)(C).

*Id.* at 170 n.13.

**[3]** Only one circuit court has addressed that open question at any length. In *Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299, 302 (11th Cir. 1989), the Eleventh Circuit held that "Rule 803(8)(C) does not provide for the admissibility of the legal conclusions contained within an otherwise admissible public report." "Legal conclusions are inadmissible because the jury would have no way of knowing whether the preparer of the report was cognizant of the requirements underlying the legal conclusion and, if not, whether the preparer might have a higher or lower standard than the law requires." *Id.* at 303. That court "caution[ed], however, that the amorphous line between 'factual' and 'legal' conclusions may obscure a practical analysis under this rubric." *Id.* The Fourth Circuit has agreed, albeit without analysis. *See Zeus Enters., Inc. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 243 (4th Cir. 1999) ("The NTSB order involved no factual determinations and was strictly a legal ruling. As such, the NTSB order was not admissible under Rule 803(8)(C).").

**[4]** We agree with the Eleventh and Fourth Circuits. Pure legal conclusions are not admissible as factual findings. In the context of a summary judgment motion, a conclusion of law by a third-party investigator does not, by itself, create a genuine issue of material fact for the obvious reason that a legal conclusion is not a factual statement and for the reasons explained by the Eleventh Circuit. Accordingly, the district court properly held that the DOL Report's legal conclusion

that Dollar Tree is a successor in interest under the FMLA does not create a genuine issue of material fact.

### b. *"Trustworthy" Requirement*

**[5]** The district court held that the remainder of the DOL Report, to the extent that it contains factual findings, is inadmissible as not "trustworthy."[4] In *Beech Aircraft*, 488 U.S. at 167-68, the Supreme Court emphasized that, although a broad range of factual findings are *potentially* admissible under Rule 803(8)(C), the district court retains the discretion to exclude findings that are not trustworthy. *See id.* at 167 ("Thus, a trial judge has the discretion, and indeed the obligation, to exclude an entire report or portions thereof . . . that she determines to be untrustworthy."). Relevant factors include "(1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation." *Id.* at 167 n.11 (citation omitted). "A party opposing the introduction of a public record bears the burden of coming forward with enough negative factors to persuade a court that a report should not be admitted." *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir. 1992).

**[6]** The district court acted within its discretion when it held that the DOL Report is not trustworthy. The report is incomplete because its exhibits are not attached. Its author is unidentified and unknown, making it impossible to assess the author's skill or experience. No hearing was held. The document does not appear even to be a final report, as distinct from an internal draft: "It is *recommended* that this case *be administratively closed* as a partial agreement to pay." DOL

---

[4]Many of the "factual findings" are more easily characterized as conclusions of law, which are inadmissible for the reasons previously explained in text. Nevertheless, because we reach the same conclusion either way, we—like the district court—treat all statements other than the "successor in interest" statement as factual findings.

Report at 8 (emphases added). The DOL did not issue the report or send it to either party at any time before this litigation; rather, it became available only because Plaintiff filed a request pursuant to the Freedom of Information Act, 5 U.S.C. § 552. Accordingly, we—like the district court—do not consider the disputed portion of the DOL Report as evidence in our analysis of the successorship issue.

### 2.  *Plaintiff's Affidavit*

Next, Plaintiff contends that the district court improperly rejected some of the factual assertions in her affidavit as being too vague and non-specific. We review de novo and note the following relevant statements in the affidavit:

> Dollar Tree Stores continued in the same retail business operation as Factory 2-U. Dollar Tree Stores used the same rental space as the Factory 2-U store they took over, so I kept working in the same store I had been in for over four years. Most of the same personnel continued to work when Dollar Tree took Factory 2-U over at my store. We continued to employ retail sales people who worked during regular store hours. The same supervisory personnel continued with the opening of Dollar Tree Store, such as [three named individuals]. The products continued to include clothing along with other personal, gift and household items.

We find it unnecessary to quibble with most of Plaintiff's statements. Although her statements are indeed vague, we find little reason to reject her characterization, for instance, that Dollar Tree "took over" the rental space, as distinct from merely purchasing the leasehold from Factory 2-U. Similarly, whether one characterizes the merchandise, as Plaintiff does, as "clothing along with other personal, gift and household items" or, as Dollar Tree does, as "items including some clothing" matters little to the ultimate analysis of successor in

interest. Although the district court is probably correct that Plaintiff's characterizations are self-serving exaggerations, we nevertheless will adopt Plaintiff's characterizations for purposes of our analysis.

Plaintiff's assertion concerning the number of employees is a different issue. Dollar Tree provided detailed factual assertions about which employees it hired and for what purposes. According to Dollar Tree, it hired a small number of employees to help with the four-week remodeling and transition period, and it hired only *two* employees—Plaintiff and one other—to continue working after the Pasco Dollar Tree opened its doors for regular business.

**[7]** By contrast, Plaintiff supplied only the vaguest conclusion: "most of the same personnel continued to work when Dollar Tree took Factory 2-U over." Is Plaintiff counting all persons who worked on the transition team? Does she intend to dispute the otherwise undisputed evidence that only two persons worked at the store when it opened at the end of October?[5] Those questions matter, because continuity of the workforce is a relevant factor.

**[8]** Federal Rule of Civil Procedure 56(e)(2) requires a party to "set out *specific facts* showing a genuine issue for trial." (Emphasis added.) In *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990), the Supreme Court explained that, unlike when ruling on a motion to dismiss, when the court "presumes that general allegations embrace those specific facts that are necessary to support the claim," Rule 56(e) requires that the party opposing a motion for summary judgment set out *specific* facts—that is, the court will not presume that general allegations embrace more specific

---

[5]The statement is vague enough that it could even be read to include persons who continued to work *elsewhere*, at stores unrelated to Dollar Tree: "most of the same personnel continued to work [*somewhere*] when Dollar Tree took Factory 2-U over."

facts to support the claim. *Id.* at 889. The Court acknowledged that "[a]t the margins there is some room for debate as to how 'specific' must be the 'specific facts' that Rule 56(e) requires in a particular case." *Id.* But it found the general allegations in that case to be too vague. *Id.* at 888-89.

There, the plaintiffs were required to present facts supporting their allegation that they had been "adversely affected or aggrieved." *Id.* at 889. Their general assertions were insufficient: "Rule 56(e) is assuredly not satisfied by averments which state only that one of respondent's members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action." *Id.* The Court explained:

> It will not do to "presume" the missing facts because without them the affidavits would not establish the injury that they generally allege. That converts the operation of Rule 56 to a circular promenade: plaintiff's complaint makes general allegation of injury; defendant contests through Rule 56 existence of specific facts to support injury; plaintiff responds with affidavit containing general allegation of injury, which must be deemed to constitute averment of requisite specific facts since otherwise allegation of injury would be unsupported (which is precisely what defendant claims it is).

*Id.*

**[9]** Here, we hold that, in light of the specific facts presented by Dollar Tree regarding the number of employees retained, Plaintiff's assertion that "most" employees were rehired by Dollar Tree is too vague to satisfy Rule 56(e)'s requirement of specificity. In support of its motion for summary judgment, Dollar Tree carefully explained exactly which employees, by name, had been rehired and for what purposes.

At that point, "[i]t became [Plaintiff's] burden, in order to defeat the motion, to 'set out specific facts showing a genuine issue for trial.' " *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)). Plaintiff's assertion of "most" employees appears to conflict with Dollar Tree's evidence but, as described above, her vague assertion leaves entirely unclear the nature of that conflict, if any.[6] We therefore hold that the district court properly disregarded Plaintiff's unsupported and unexplained assertion. Likewise, in our analysis of the successor in interest issue, we will disregard Plaintiff's assertion.

B.    *Successor in Interest*

[10] The FMLA entitles "an eligible employee" to take family or medical leave for several enumerated reasons, including to care for a close relative. 29 U.S.C. § 2612(a)(1). "The term 'eligible employee' means an employee who has been employed (i) for at least 12 months by the employer with respect to whom leave is requested . . . ." *Id.* § 2611(2)(A). That is, an employee is not eligible for family or medical leave until he or she has worked for an employer for 12 months. The term "employer" generally means a person or entity engaged in commerce with a minimum number of employees. *Id.* § 2611(4)(A)(i). Additionally, however, the term "employer" "includes . . . any successor in interest of an employer." *Id.* § 2611(4)(A)(ii)(II).

Here, Plaintiff challenges a denial of leave that occurred several months shy of her one-year anniversary of employment with Dollar Tree. The FMLA covers the purpose of that leave, to care for a seriously ill parent. But, without the "successor in interest" provision, Plaintiff was not an "eligible employee." The dispositive question, then, is whether Dollar Tree is a "successor in interest" to Factory 2-U.

---

[6]We need not address whether "most" would be specific enough in the absence of detailed evidence to the contrary.

**[11]** The FMLA does not define the term "successor in interest." The Department of Labor has issued the following regulation:

(a) For purposes of FMLA, in determining whether an employer is covered because it is a "successor in interest" to a covered employer, the factors used under Title VII of the Civil Rights Act and the Vietnam Era Veterans' Adjustment Act will be considered. However, unlike Title VII, whether the successor has notice of the employee's claim is not a consideration. Notice may be relevant, however, in determining successor liability for violations of the predecessor. The factors to be considered include:

(1) Substantial continuity of the same business operations;

(2) Use of the same plant;

(3) Continuity of the work force;

(4) Similarity of jobs and working conditions;

(5) Similarity of supervisory personnel;

(6) Similarity in machinery, equipment, and production methods;

(7) Similarity of products or services; and

(8) The ability of the predecessor to provide relief.

(b) A determination of whether or not a "successor in interest" exists is not determined by the applica-

tion of any single criterion, but rather the entire circumstances are to be viewed in their totality.

29 C.F.R. § 825.107.

As the regulation itself acknowledges and incorporates, the "successor in interest" inquiry has arisen in many contexts and has a long history in case law. *See Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 550-56 (6th Cir. 2006) (recounting the history in some detail). Briefly, the "successor in interest" doctrine arose initially in traditional labor-law cases involving disputes between a new employer and the union recognized by the former employer. *See, e.g.*, *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964) (holding that the new employer must arbitrate under the old collective bargaining agreement); *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272 (1972) (holding that the new employer must negotiate with the former union, but the new employer is not bound by the old collective bargaining agreement); *Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249 (1974) (holding that the new employer is not required to arbitrate under the old collective bargaining agreement and distinguishing *Wiley*); *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27 (1987) (holding that the new employer must bargain with the old union, if the new employer is a true successor, and discussing factors). Courts later adopted and applied the same considerations in Title VII cases. *See, e.g.*, *Bates v. Pac. Mar. Ass'n*, 744 F.2d 705, 708 (9th Cir. 1984) ("Different policy considerations and enforcement mechanisms are incorporated in Title VII [than in the labor-law context]; nonetheless, we have held the successorship doctrine to apply to Title VII obligations." (citing cases)); *EEOC v. Mac-Millan Bloedel Containers, Inc.*, 503 F.2d 1086, 1090 (6th Cir. 1974) ("We are of the view that the considerations set forth by the Supreme Court in these [labor-law] cases as justifying a successor doctrine to remedy unfair labor practices are applicable equally to remedy unfair employment practices in violation of Title VII."); *see also Steinbach v. Hubbard*, 51

F.3d 843, 845 (9th Cir. 1995) (holding that the doctrine also applies to the Fair Labor and Standards Act).

The factors that appear in the FMLA regulation, quoted above, are nearly verbatim the factors developed by this and other circuits in the labor-law and Title VII contexts. *See, e.g.*, *NLRB v. Jeffries Lithograph Co.*, 752 F.2d 459, 463 (9th Cir. 1985) (listing the factors); *MacMillan*, 503 F.2d at 1094 (same). Those factors elaborated on an earlier formulation querying whether "the new employer conducts essentially the same business that the old employer conducted." *Jeffries*, 752 F.2d at 463. In other words, the general thrust of the inquiry is whether the new business is "essentially the same" as the old business.

The inquiry is not merely whether the new employer is a "successor" in the strict corporate-law sense of the term. The successorship inquiry in the labor-law context is much broader. *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 182 n.5 (1973). "The refusal to [adhere to the strict corporate-law definition] is attributable to the fact that, so long as there is a continuity in the employing industry, the public policies underlying the doctrine will be served by its broad application." *Id.* (internal quotation marks omitted).

"Because the origins of successor liability are equitable, fairness is a prime consideration in its application." *Criswell v. Delta Air Lines, Inc.*, 868 F.2d 1093, 1094 (9th Cir. 1989); *see also Bates*, 744 F.2d at 710 (holding that "fairness and necessity are inherent considerations in successorship analysis"). Courts have stressed the intensely fact-specific nature of the inquiry. *See, e.g.*, *Fall River*, 482 U.S. at 43 (holding that the successor inquiry "is primarily factual in nature and is based upon the totality of the circumstances of a given situation"); *Howard Johnson*, 417 U.S. at 256 ("Particularly in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its reso-

lution, emphasis on the facts of each case as it arises is especially appropriate."); *Burns*, 406 U.S. at 274 ("Resolution turns to a great extent on the precise facts involved here."); *see also Haw. Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289, 293 (9th Cir. 1987) ("The inquiry we undertake is more functional than formal.").

The inquiry depends not only on the facts related to the new and old employers, but also on the nature of the legal obligation at issue. As the Supreme Court has stated:

> [T]he real question in each of these "successorship" cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative? The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of "successor" which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others.

*Howard Johnson*, 417 U.S. at 262 n.9. Adhering to that explanation, we have stated that "[d]ecisions on successorship must balance, *inter alia*, the national policies underlying the statute at issue and the interests of the affected parties." *Steinbach*, 51 F.3d at 846; *see also Cobb*, 452 F.3d at 554 ("The ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy."). Finally, the Supreme Court has held that courts must examine the successorship question from the viewpoint of the employee: "In conducting the analysis, [the court] keeps in mind the question whether 'those employees

who have been retained will understandably view their job situations as essentially unaltered.' " *Fall River*, 482 U.S. at 43 (quoting *Golden State Bottling Co.*, 414 U.S. at 184; *Jeffries*, 752 F.2d at 464)).

**[12]** Only the Sixth Circuit and a handful of district courts have analyzed the successorship inquiry under the FMLA. *Grace*, 521 F.3d 655; *Cobb*, 452 F.3d 543; *Finnerty v. Wireless Retail, Inc.*, 624 F. Supp. 2d 642 (E.D. Mich. 2009), *aff'd on other grounds*, No. 09-2192, 2010 WL 3069608 (6th Cir. Aug. 5, 2010) (unpublished); *Cobain v. Destination Hotels & Resorts*, No. 05-2248, 2007 WL 1589533 (E.D. Cal. June 1, 2007) (unpublished); *Lombardo v. Air Prods. & Chems., Inc.*, No. 05-1120, 2006 WL 1892677 (E.D. Pa. July 7, 2006) (unpublished); *Miller v. Level 3 Commc'ns, LLC*, No. 03-4451, 2005 WL 1529419 (D.N.J. June 29, 2005) (unpublished); *Carlson v. Rent-A-Center, Inc.*, 237 F. Supp. 2d 114 (D. Me. 2003); *Slaughter v. Am. Bldg. Maint. Co. of N.Y.*, 64 F. Supp. 2d 319 (S.D.N.Y. 1999); *Barrilleaux v. Thayer Lodging Group, Inc.*, No. 97-3252, 1999 WL 144110 (E.D. La. Mar. 12,1999) (unpublished); *Vanderhoof v. Life Extension Inst.*, 988 F. Supp. 507 (D.N.J. 1997); *Jolliffe v. Mitchell*, 971 F. Supp. 1039 (W.D. Va. 1997); *Rhoads v. FDIC*, 956 F. Supp. 1239 (D. Md. 1997), *rev'd in other part*, 257 F.3d 373 (4th Cir. 2001). Those courts generally have adopted the same considerations applied in other contexts: The inquiry is fact-specific, fairness is a primary consideration, and courts must balance the interests of the parties with the federal policy underlying the FMLA.

**[13]** With respect to balancing the equities, the Sixth Circuit has taken a broad approach toward finding successorship. *Grace*, 521 F.3d at 672-75; *Cobb*, 452 F.3d at 556-57. "A stated purpose of the FMLA is 'to entitle employees to take reasonable leave for medical reasons.' " *Cobb*, 452 F.3d at 556 (quoting 29 U.S.C. § 2601(b)(2)). When the eight factors listed in the DOL regulation support a finding of successorship, that important purpose is fulfilled. *Id.* at 556-57. Simi-

larly, a new employer who hires its employees from the old employer "benefit[s] from the stability and continuity created by the retention of long-term employees of its predecessor." *Grace*, 521 F.3d at 674-75. The Sixth Circuit explained that congressional intent with respect to the 12-month waiting period was to exclude seasonal and temporary workers, not long-term employees whose former employer merely shifted form. *Id.* at 675. The federal policy of granting leave to long-term employees is fulfilled by a finding of successorship. *Id.*

**[14]** The Sixth Circuit held that the balancing of the equities is the true test, while the regulation's eight factors simply assist in the inquiry:

> [T]he eight factors are "not in themselves the test for successor liability." Rather they are factors in an overarching, three-part test considering the *equities* of imposing a particular legal obligation on a successor: (1) the interests of the plaintiff-employee, (2) the interests of the defendant-employer, and (3) the federal policy goals of the statute.

*Grace*, 521 F.3d at 672 (quoting *Cobb*, 452 F.3d at 555); *see also Criswell*, 868 F.2d at 1094 (noting that successor liability began an equitable doctrine to assure fairness). Our discussion will turn first to the eight factors,[7] then to the overarching considerations.

---

[7]The eight factors are not entirely independent, as certain facts are relevant to more than one factor. We remain cognizant of this overlap as we assess the various factors and the overarching considerations. The analysis is holistic and does not depend on a rigid tally of factors in support and factors in opposition. *See Finnerty*, 624 F. Supp. 2d at 658 (recognizing both the redundancy in the factors and the redundancy's irrelevance because of the holistic nature of the inquiry); *see also* 29 C.F.R. § 825.107(b) ("A determination of whether or not a 'successor in interest' exists is not determined by the application of any single criterion, but rather the entire circumstances are to be viewed in their totality.").

1. *"Substantial continuity of the same business operations"*

Where a Factory 2-U store once stood, a Dollar Tree now operates after a substantial renovation. Dollar Tree purchased the lease on the building, but absolutely nothing else. Although both stores sell some clothing, it is undisputed that Dollar Tree did not acquire *any* of Factory 2-U's merchandise; that Dollar Tree sells a wide variety of merchandise whereas Factory 2-U sold clothing only; and that Dollar Tree sells items for $1 only whereas Factory 2-U sold clothing at many different prices. Both stores operated a retail business selling discounted merchandise, but the similarities end there. This factor strongly supports a conclusion that Dollar Tree is not a successor to Factory 2-U.

In most cases in which courts have found substantial continuity, the new employer simply assumed a contract over a particular business function with few, if any, changes to the operation of the business. For instance, in *Cobb*, 452 F.3d at 546, the United States Postal Service ("USPS") contracted with a trucking company to deliver mail on specified routes. At the end of a contract term, a new employer won the contract and hired the old employer's truck drivers, including the plaintiff. *Id.* at 546-47. The plaintiff continued to deliver mail along the same routes, using the same trucks. *Id.* at 547. The court held that substantial continuity existed because, "[i]n reality, it [is] as if Plaintiff works for the USPS and not for one particular trucking company. Only the management, not the job, has changed." *Id.* at 557.

Similarly, in *Grace*, 521 F.3d at 660, the court found substantial continuity where the plaintiff worked for a government agency through "various contracting houses." When a new contracting house won the contract bid, it hired the plaintiff and many others to continue performing the same services. *Id.* "The plaintiff was employed continuously since 1996 and her duties stayed the same throughout her move

from one placement agency to another." *Id.*; *see also Barrilleaux*, 1999 WL 144110, at *2 (finding substantial continuity where employee was "re-hired" the same day on which the old hotel employer was purchased by the new employer and the employee continued performing the same duties); *Vanderhoof*, 988 F. Supp. at 513 (finding substantial continuity where the employees had the same job and duties and the only difference was that they "merely had to fill out new paperwork"); *Jolliffe*, 971 F. Supp. at 1042 (finding substantial continuity where job duties of sheriff's secretary were identical, even though a new sheriff was elected).

The facts here are vastly different despite Plaintiff's statement that Dollar Tree "continued in the same retail business operation." That both stores were "retail business operations" is too general to demonstrate substantial continuity giving rise to successorship liability. Were it otherwise, the replacement of a Safeway by a Saks Fifth Avenue, after a month of renovations, would create successorship liability.

Additionally, in most cases in which continuity is found, there is no break in operations: The employees continue working on day one of new employment just as they had on the last day of their former employment. Here, the transition period of almost a month—when the store was closed to the public, and when Plaintiff underwent two weeks of training and two weeks of helping prepare the new store for regular business—further distinguishes the present situation from those other cases.

### 2. *"Use of the same plant"*

The regulation's use of the word "plant" is potentially misleading. The term originated in the manufacturing context of the original labor-law cases involving successorship. Because the terminology is manufacturing-specific, it is arguable that this factor does not apply to non-manufacturing contexts, but that view would be too narrow. The appropriate inquiry is

whether the new employer uses the same facilities. The term "plant" is simply a carry-over from the manufacturing context, and there is nothing in the statute, the regulation, or in their history or purposes to suggest that this factor applies only to some places of employment. Accordingly, the courts properly have understood this factor to concern the use of the same physical facilities. *See Cobain*, 2007 WL 1589533, at *16 (considering whether the new employer used "the same buildings and facilities"); *Rhoads*, 956 F. Supp. at 1253 (considering whether the new employer used "the same facilities").

Considering whether the new employer continued to use the same facility, we conclude that this factor is neutral. Dollar Tree used the same location and building shell as Factory 2-U's former store, which points in favor of successorship. On the other hand, Dollar Tree spent weeks renovating the interior to meet its own design specifications. So, although the new store was in the same physical location, the interior had been substantially renovated, nullifying the effect of this factor.

3.    *"Continuity of the work force"*

Dollar Tree hired only a small number of employees to help during the four-week transition period between the closing of the Pasco Factory 2-U and the opening of the Dollar Tree, which suggests less than a robust continuity of the work force. Because the focus of our inquiry is on the continuity of business operations overall, though, the more important period of time to consider is after the store re-opened. The transitional period may have provided a few additional weeks of employment for some employees. But, when one considers whether the new employer continued to employ the old work force, the more relevant comparison is between the regularly functioning old business and the regularly functioning new business.

As discussed above, in Part A-2, only Plaintiff and one other employee continued to work at the Pasco Dollar Tree

store after it opened for regular business. Accordingly, this factor strongly supports a conclusion that Dollar Tree is not a successor to Factory 2-U. There is almost no continuity of work force when only two former employees are hired from a much larger pool of former employees.

4.    *"Similarity of jobs and working conditions"*

This factor is difficult to assess because there is no evidence in the record concerning the specific nature of the jobs or the working conditions. Plaintiff avers in her affidavit that "the store continued to employ retail sales people who worked during regular store hours," but there is nothing further from either party.

Viewing the evidence in the light most favorable to Plaintiff, with the benefit of generous inferences in her favor, this factor very slightly supports a finding of successorship. The jobs likely were of the same kind: cashiers and shelf-stockers, along with a few managers. The working conditions likely were similar as well, as both the old and new employers operated retail business chains during "regular" hours.

5.    *"Similarity of supervisory personnel"*

This factor suggests no successorship. Plaintiff was the Factory 2-U store manager in Pasco. Dollar Tree employed a new store manager when it opened the Pasco store, even though Plaintiff remained as an assistant manager, and the record discloses no overlap in upper management between Factory 2-U and Dollar Tree.

6.    *"Similarity in machinery, equipment, and production methods"*

Neither party presented evidence on this factor beyond a general description of the different types of retail businesses operated by Factory 2-U and Dollar Tree. Nonetheless, view-

ing the record in Plaintiff's favor, and giving her the benefit of generous inferences, this factor appears to support a finding of successorship. Both stores likely used cash registers, hand trucks, and other equipment usually associated with a retail business chain. This support is slight, however, because such equipment is common to most retail businesses.

As with the factor related to the same "plant," this factor too is potentially misleading because it uses manufacturing-specific words ("machinery" and "production methods"). Indeed, some courts have concluded that, for that reason, this factor does not apply in a non-manufacturing context. *Cobain*, 2007 WL 1589533, at *18; *Vanderhoof*, 988 F. Supp. at 514; *Rhoads*, 956 F. Supp. at 1253-54. We disagree, for the reasons discussed above in Part B-2.

### 7.  *"Similarity of products or services"*

Both stores sold the same general type of products: discounted retail items. Again, though, that level of generality does not advance the analysis.

Factory 2-U sold clothing only. Dollar Tree sold a wider variety of products (including—in the words of Plaintiff's affidavit—"personal, gift and household items"). Dollar Tree sold at a particular price point, whereas Factory 2-U sold its clothing at a range of prices. Dollar Tree did not purchase any of Factory 2-U's merchandise but, instead, brought in entirely new inventory. Because of those differences, this factor supports a finding against successorship.

### 8.  *"The ability of the predecessor to provide relief"*

Some courts have held that this factor is inapplicable to FMLA claims arising after the transition from old employer to new employer. *Cobain*, 2007 WL 1589533, at *18; *Vanderhoof*, 988 F. Supp. at 514; *Rhoads*, 956 F. Supp. at

1253. We agree. A former employer cannot grant leave to a person no longer employed by it.

### 9.  *Conclusion and Balancing of Equities*

Some equitable considerations favor successorship. Finding successorship always promotes the congressional purpose of granting employees leave, because it expands the number of employees covered. Additionally, as in *Grace*, Plaintiff here was not a seasonal or temporary worker whom Congress clearly intended to exclude; she was a permanent employee, meant to be employed for an indefinite period. If Congress intended to exclude only seasonal or temporary workers, then the policies of the FMLA would best be met by a finding of successorship here.

But that intent is far from clear. Although some legislative history suggests that Congress aimed the 12-month requirement at least in part to exclude seasonal and temporary workers, *see Cobb*, 452 F.3d at 557 (noting that legislative history), the text of the provision is decidedly broader. Had Congress intended to exclude *only* seasonal and temporary workers, it easily could have written the statute to say so, but it did not. As it is, *all* employees, even those whom the employer intends to employ indefinitely, must wait 12 months before becoming "eligible" under FMLA. 29 U.S.C. § 2611(2)(A)(i). Perhaps the 12-month requirement was a legislative compromise to lessen the impact on employers, much as the minimum number of employees serves as a compromise between *full* coverage and *no* coverage. Whatever its genesis, though, the provision as written plainly requires 12 months of employment by an employer (either in its present form or as a successor in interest) to establish eligibility for FMLA benefits. A finding of no successorship advances Congress' purpose of having all employees wait 12 months to obtain FMLA coverage.

**[15]** Turning to the factors discussed above, we conclude that, although some factors slightly suggest successorship, on

balance the factors lead strongly to the conclusion that, as a matter of law, Dollar Tree was not a successor in interest to Factory 2-U. When Factory 2-U declared bankruptcy, Dollar Tree purchased only its lease on the Pasco store (and some other leases irrelevant here). Dollar Tree did rehire a few of Factory 2-U's employees, and its generically described business operation (consumer retail store offering discounted products) is similar to Factory 2-U's. But the similarities end there. Dollar Tree purchased no inventory of Factory 2-U; it required Factory 2-U's employees to apply for jobs with Dollar Tree if they wanted to work for Dollar Tree; it brought in many of its own employees or newly hired employees; it closed the store for a month to perform renovations, train employees in its own methods, and set up; it changed Plaintiff's job title and responsibilities; it assigned a new store manager; it brought in all new inventory, including different clothing and many kinds of products never sold by Factory 2-U; and it used an entirely different pricing structure for its products.

[16] In summary, considering all the regulatory factors as a whole, the interests of Plaintiff and Dollar Tree, the policy goals of the FMLA, and the equities disclosed in the record, we hold that Dollar Tree is not a "successor in interest" to Factory 2-U within the meaning of the FMLA. Therefore, the district court properly granted summary judgment to Dollar Tree.

   **AFFIRMED.**