49 F.3d 1410
 75 A.F.T.R.2d 95-1349, 63 USLW 2587,
95-1 USTC P 50,132,
18 Employee Benefits Cas. 2877,
Pens. Plan Guide P 23905Q
 CITRUS VALLEY ESTATES, INC., Petitioner-Appellee,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellant.
CITRUS VALLEY ESTATES, INC., Petitioner-Appellee,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellant.
Robert J. DAVIS; Janice A. Davis, Petitioners-Appellees,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellant.
OLD FRONTIER INVESTMENT, INC., OF ARIZONA, Petitioner-Appellee,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellant.
Robert STEPHAN, Jr., Petitioner-Appellee,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellant.
BOREN STEEL CONSULTANTS, INC., Petitioner-Appellee,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellant.
BOREN STEEL CONSULTANTS, INC., Petitioner-Appellee,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellant.
LEAR EYE CLINIC, LTD., an Arizona professional corporation,
Petitioner-Appellee,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellant.
LEAR EYE CLINIC, LTD., an Arizona professional corporation,
Petitioner-Appellee,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellant.
ARIZONA ORTHOPEDIC INSTITUTE OF TRAUMATIC AND RECONSTRUCTIVE
SURGERY, P.C., Petitioner-Appellee,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellant.
Jonathan R. FOX; Renee K. Fox, Petitioners-Appellees,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellant.
BRODY ENTERPRISES, INC., Petitioner-Appellee,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellant.
 Nos. 93-70486 to 93-70488, 93-70491 to 93-70496, 93-70498 to
93-70500.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 15, 1994.
Decided March 8, 1995.
 
 Gary R. Allen and Thomas J. Clark, Tax Div., U.S. Dept. of Justice, Washington, DC, for respondent-appellant.
 Gregory A. Robinson and Karen S. Kingzett, Farley, Robinson & Larsen, Neil H. Hiller, Ermann & Hiller, Brad S. Ostroff, Burch & Cracchiolo, Phoenix, AZ, for petitioners-appellees.
 David R. Levin, Reish & Luftman, Washington, DC, for amicus.
 Appeals from a Decision of the United States Tax Court.
 Before: ALARCON and HALL, Circuit Judges, and KING.*
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 Appellees (collectively, "Taxpayers") are all small businesses or professional corporations. Each had in place a qualified individual defined benefit ("IDB") pension plan for employees. In 1989, the Internal Revenue Service audited Taxpayers' IDB plans as part of the Service's so-called Small Plan Audit Program. The Small Plan Audit Program represented the Service's attempt to crack down on what it believed were abusive tax practices.
 
 
 2
 As part of the Small Plan Audit Program, the Service audited thousands of IDB plans. Many plan sponsors were assessed deficiencies in and additions to their federal income tax. Several petitioned the Tax Court for review. See 26 U.S.C. Sec. 6213. Three cases were selected and tried by the Tax Court as test cases. Two involved defined benefit pension plans for partners of prominent law firms. In both, the Tax Court found for the plan sponsors, and the court of appeals affirmed. See Wachtell, Lipton, Rosen & Katz v. Commissioner, 26 F.3d 291 (2d Cir.1994) (affirming the Tax Court); Vinson & Elkins v. Commissioner, 7 F.3d 1235 (5th Cir.1993) (same).
 
 
 3
 The third case is the subject of this appeal. It includes 12 consolidated petitions, often referred to in this litigation as the "Phoenix Cases." The Tax Court held in favor of Taxpayers, except with respect to certain findings that Taxpayers do not appeal. Citrus Valley Estates, Inc., et al., v. Commissioner, 99 T.C. 379, 1992 WL 238873 (1992) (hereinafter "Citrus Valley Estates "). The Commissioner timely appealed. We have jurisdiction pursuant to 26 U.S.C. Sec. 7482 (1988).
 
 
 4
 The Commissioner advances four claims on appeal. First, she argues that the Tax Court misconstrued the Internal Revenue Code ("Code") section 412(c)(3) standards for the deductibility of IDB plan contributions.[1] Second, she contends that the Tax Court erred in holding that actuarial assumptions should not be changed retroactively unless "substantially unreasonable." Third, she claims that two plans violated the Code section 415(b) limitations on plan benefits. Finally, she argues that the Tax Court erred in allowing plan sponsors that used the unit credit funding method to allocate to normal cost the entire amount of benefits that accrue in a particular plan year and take an immediate deduction. We review each of the Commissioner's arguments in turn.
 
 I.
 
 5
 An IDB plan provides its participants at retirement with a predetermined pension benefit. To ensure that IDB plans are able to deliver the promised retirement benefit, the Tax Code imposes minimum funding standards. E.g., Code Sec. 412. Even with the statutory guidelines, however, plan funding often involves more art than science, because the ultimate cost of a plan cannot be calculated in advance with any certainty.
 
 
 6
 The uncertainty stems from the fact that the ultimate cost of an IDB plan depends on several unknown variables, including: (1) the rate of return on the plan's investments; (2) the date plan benefits commence; (3) the administrative costs associated with maintaining the plan; and (4) the period of time during which benefits will be paid. To help resolve this problem, plan sponsors must hire an enrolled actuary to make assumptions about the unknown variables. See Code Sec. 6059. These assumptions are used to calculate the amount an employer must contribute to satisfy the Code's minimum funding standards. See Code Sec. 412.
 
 
 7
 Under the Tax Code, employers get a deduction in the amount necessary to meet their funding obligations, so long as the funding standards are calculated according to acceptable actuarial assumptions. In the words of the statute:
 
 
 8
 [A]ll costs, liabilities, rates of interest, and other factors under the plan shall be determined on the basis of actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan.
 
 
 9
 Code Sec. 412(c)(3); see Code Sec. 404(a)(1)(A) ("In determining the amount deductible[,] ... the funding method and actuarial assumptions used shall be those used ... under section 412....").
 
 
 10
 In this case, the Commissioner challenged before the Tax Court the actuarial assumptions employed in the Taxpayers' IDB plans.[2] The Commissioner argued that the assumptions failed the section 412(c)(3) standard because they were not reasonable in the aggregate and did not represent the plan actuaries' best estimate of anticipated plan experience. The Commissioner further argued that as a result of the flawed assumptions, portions of Taxpayers' plan contributions were not deductible under section 404(a)(1)(A).
 
 
 11
 The Tax Court rejected the Commissioner's attack and found that the challenged assumptions in each plan were reasonable in the aggregate and represented the actuaries' best estimate of anticipated plan experience in accordance with section 412(c)(3). Citrus Valley Estates, 99 T.C. at 465 (holding that plan contributions were properly deducted). The court recognized that the estimates generally fell on the conservative end of the range of acceptable assumptions, but nonetheless found that the assumptions passed the statutory standard.
 
 
 12
 The Tax Court premised its findings on the belief that the primary duty of a plan actuary was to calculate a funding pattern that safeguards the ability of the plan to deliver the promised retirement benefit. Given this duty, the Tax Court held that it was appropriate for actuaries to maintain long-term conservative views in selecting actuarial assumptions, because cautious estimates result in higher levels of initial plan funding. Id. at 410-12, 426. The Tax Court noted that an element of actuarial conservatism was especially appropriate for new IDB plans that lack credible experience, as all of the plans in question indisputably did. Id. at 411.
 
 
 13
 The Commissioner appeals the Tax Court's conclusion. Her challenge is entirely legal. She contends that the Tax Court misconstrued section 412(c)(3) and that as a result the court's findings are "robbed of all vitality." Appellant's Opening Brief in Citrus Valley Estates, Inc. v. Commissioner, No. 93-70486, at 16. She urges the Court to remand the Phoenix Cases for reconsideration in light of what she argues are the correct legal standards. We review de novo the Tax Court's construction of the Code. See Estate of Poletti v. Commissioner, 34 F.3d 742, 745 (9th Cir.1994).
 
 
 14
 The essence of the Commissioner's complaint is that by endorsing the use of conservative actuarial assumptions, the Tax Court effectively read the "best estimate" provision out of section 412(c)(3). Although the Tax Court expressly found the "best estimate" provision satisfied in each case, the Commissioner argues that the Tax Court misapprehended the nature of the inquiry. Her position, simply stated, is that an assumption cannot be an actuary's "best estimate" if it reflects a more conservative view of an anticipated plan experience than the actuary believes is likely.
 
 
 15
 As Commissioner reads section 412(c)(3), not only must assumptions be reasonable in the aggregate, but also they must accurately reflect the actuary's subjective belief about the future. In other words, if a plan actuary selects a set of assumptions that the actuary personally does not believe will come true, the assumptions fail the section 412(c)(3) test, even if they are otherwise reasonable in the aggregate, because they do not reflect the actuary's "best estimate" of anticipated plan experience. According to the Commissioner, the Tax Court's findings in this case are infirm because the court did not review the challenged assumptions under this substantive "best estimate" standard.
 
 
 16
 Without a doubt, the language of section 412(c)(3) can be read to support the Commissioner's reading. In addition, given the wide range of reasonable assumptions, requiring actuaries neutrally to pick the most likely result within the range would limit the ability of taxpayers to inflate their contribution deductions. These arguments notwithstanding, we follow the lead of the Second and Fifth Circuits and reject the Commissioner's reading of section 412(c)(3). See Wachtell, Lipton, Rosen & Katz, 26 F.3d at 295-96; Vinson & Elkins, 7 F.3d at 1237-39.
 
 
 17
 We begin our analysis with the recognition that Congress consciously left the specifics of IDB plan funding in the able hands of professional actuaries. See Vinson & Elkins, 7 F.3d at 1238. Although Congress initially toyed with the idea of legislating mandatory funding assumptions and methods for IDB plans, it quickly rejected the notion as excessively inflexible, even though it understood that giving actuaries room in which to exercise their professional judgment would result in a broad range of funding assumptions. See Vinson & Elkins, 7 F.3d at 1238; see also H.R.Rep. No. 807, 93d Cong., 2d Sess. 27 (1974), reprinted in 1974 U.S.C.C.A.N. 4670, 4694. We will not disturb this legislative choice to delegate to actuaries an important role in plan funding decisions. Accord, Wachtell, Lipton, Rosen & Katz, 26 F.3d at 295-96 (citing S.Rep. No. 383, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 4890, 4908 ("[T]he actuarial assumptions made by actuaries in estimating future pension costs are crucial to the application of minimum funding standards for pension plans.")).
 
 
 18
 We further note that the section 412(c)(3) limitations on actuarial assumptions serve not only as a limit on maximum deductions, but also as a floor for minimum plan funding. This statutory scheme serves the dual but sometimes conflicting goals of guaranteeing adequate plan funding while preventing taxpayer abuse. "Within the range of reasonableness, Congress assigned the task of balancing these goals to actuaries. We will not narrow the statutory gap between the Scylla of underfunding and the Charybdis of tax penalties." Vinson & Elkins, 7 F.3d at 1238. So long as the actuary's funding decisions fall within the range of reasonableness, the substantive provisions of section 412(c)(3) are satisfied.
 
 
 19
 This means that the "best estimate" provision of section 412(c)(3), properly construed, is essentially procedural in nature. Accord, Wachtell, Lipton, Rosen & Katz, 26 F.3d at 296; Vinson & Elkins, 7 F.3d at 1238. The "best estimate" language is "principally designed to insure that the chosen assumptions actually represent the actuary's own judgment rather than the dictates of plan administrators or sponsors." Wachtell, Lipton, Rosen & Katz, 26 F.3d at 296. The Commissioner does not allege, nor does it appear in the record, that anyone in this case improperly influenced the actuaries' funding decisions.
 
 
 20
 We therefore hold that the best estimate provision of section 412(c)(3) was satisfied in each of the cases before us. The mere fact that the challenged assumptions fell on the conservative end of the acceptable range does not render them invalid as a matter of law. Conservative assumptions result in a higher level of initial plan funding, which helps ensure that IDB plans will be able to deliver the promised retirement benefit when due, clearly one of ERISA's most important goals. See H.R.Rep. No. 807, 93d Cong., 2d Sess. 8 (1974), reprinted in 1974 U.S.C.C.A.N. 4670 (noting that one objective of ERISA was to ensure that participants "do not lose their benefits as a result ... [of the] failure of the pension plan to accumulate and retain sufficient funds to meet its obligations"). Although another goal was to prevent tax abuse by wealthy individuals, this concern was addressed primarily by the section 415 limits on the size of IDB plan benefits. See Code Sec. 415(b); H.R.Rep. No. 807, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 4670, 4702 (remarking that section 415 limits were enacted to prevent abuse of ERISA's favorable tax treatment by highly paid individuals).
 
 
 21
 Despite what the Commissioner asserts, our decision, faithful to the statutory scheme, does not give actuaries "unfettered liberty" to produce desirable tax results rather than prudent plan funding. First and foremost, plan funding decisions and methods must be reasonable in the aggregate. Code Sec. 412(c)(3). In addition, they must represent the actuary's professional judgment, not the tax-motivated wishes of plan sponsors or administrators. Wachtell, Lipton, Rosen & Katz, 26 F.3d at 296; Vinson & Elkins, 7 F.3d at 1238. Finally, plan actuaries must live up to national professional, ethical, and technical standards which help to minimize the risk of untoward advice.[3] Vinson & Elkins, 7 F.3d at 1238-39.
 
 
 22
 We find no legal error in the Tax Court's analysis under section 412(c)(3). The Commissioner does not separately challenge the factual findings of the Tax Court regarding the challenged assumptions. See Commissioner v. Duberstein, 363 U.S. 278, 289-91, 80 S.Ct. 1190, 1198-1200, 4 L.Ed.2d 1218 (1960) (reviewing factual findings of Tax Court for clear error). The Tax Court's conclusions therefore must stand.[4]
 
 II.
 
 23
 The Commissioner next challenges the Tax Court's use of a "substantially unreasonable" test to determine whether retroactive adjustments to actuarial assumptions were necessary. The Tax Court held that even if actuarial assumptions failed the section 412(c)(3) test, they need not be changed retroactively unless "substantially unreasonable." Citrus Valley Estates, 99 T.C. at 401-02. The rationale was that unless the assumptions were substantially out of line, prospective adjustment would suffice. But c.f., Rhoades, McKee & Boer v. United States, 43 F.3d 1071, 1074 (6th Cir.1995) (rejecting the substantially unreasonable test as inconsistent with the Code).
 
 
 24
 Even if the Commissioner were correct, her argument is beside the point. The Tax Court expressly found that the challenged assumptions were reasonable in the aggregate.[5] Id. at 465. Its alternative holding that the assumptions were not substantially unreasonable, even if error, was harmless because it could not have affected the outcome of the case. Accord, Wachtell, Lipton, Rosen & Katz, 26 F.3d at 296-98; Vinson & Elkins, 7 F.3d at 1240.
 
 III.
 
 25
 The Commissioner argues that participants in the Brody Enterprises and Lear Eye Clinic plans accrued benefits that exceeded the section 415(b) limitations on maximum benefits. In each case, plan sponsors took deductions for contributions to fund the allegedly improper benefits. The Commissioner claims that deductions for the excessive contributions should be disallowed under section 404(j)(1).
 
 
 26
 At issue is whether participants in the two affected plans properly counted their service with previous employers toward the section 415(b) maximum benefit. The participant in the Brody Enterprises plan counted, in addition to his employment with the plan sponsor, his years of employment with two unrelated law firms, as well the years he claims he maintained a private law practice while working full-time as an attorney for the Internal Revenue Service. The participant in the Lear Eye Clinic plan counted, in addition to his employment with the plan sponsor, his years of service for a corporation he claims was all but nominally the same corporation as the plan sponsor.
 
 
 27
 Although the Commissioner raised this argument below, the Tax Court neglected to address her claim in its otherwise very thorough opinion. We therefore remand Brody Enterprises, 49 F.3d 1410, and Lear Eye Clinic, 49 F.3d 1410, to the Tax Court with directions to make the appropriate findings as to whether the participants properly counted their past employment towards the section 415 maximum benefit.
 
 IV.
 
 28
 The final issue on appeal is whether IDB plans that rely on the unit credit funding method must take into account the section 415(b) limits on maximum benefits in allocating plan costs between normal costs and past service liability. The Commissioner claims that the section 415(b) limits must be taken into account.[6] The Tax Court disagreed. Citrus Valley Estates, 99 T.C. at 441-53. We review de novo the Tax Court's construction of the Code. Estate of Poletti, 34 F.3d at 745.
 
 
 29
 Again, we recognize that Congress consciously left the selection and specifics of funding methods largely in the hands of professional actuaries. The legislature's primary concern was that IDB plans employ a reasonable funding method. See Code Sec. 412(c)(3). Towards this end, it provided that plan contributions would not be deductible unless calculated according to a reasonable funding method. Code Sec. 404(a)(1)(A). We have no doubt that the unit credit funding method is, generally speaking, a reasonable funding method.[7] Indeed, the Commissioner does not dispute it.
 
 
 30
 The Commissioner limits her complaint to one aspect of the unit credit funding method. She claims that the method is unreasonable insofar as it permits plan sponsors to ignore the section 415(b) limits in allocating plan costs. The dispute centers on the timing of taxpayer's deductions. If the section 415(b) limitations need not be taken into account, plan sponsors may allocate to normal cost the entire amount of plan benefits that accrue in a particular year and take an immediate deduction. See Code Sec. 404(a)(1)(A)(iii). If, however, as the Commissioner urges, the section 415(b) limits must be taken into account, plan sponsors may only allocate one-tenth of the section 415(b) limit to normal cost each year. They must allocate the remainder to past service liability and spread the deduction for that amount over ten years. See Code Sec. 404(a)(1)(A)(iii).
 
 
 31
 In essence, the Commissioner asks us to conflate sections 412 and 415 of the Code as they relate to deductibility under section 404. We decline the invitation. The Code plainly requires a two-step process for determining the deductibility of IDB plan contributions. First, the plan must be funded within the section 415 limitations on maximum benefits. See Code Sec. 404(j)(1) (disallowing deductions for benefits in excess of Sec. 415 limitations). Next, the plan sponsor must properly compute deductible plan costs under the applicable section 412(c)(3) regulations. See Income Tax Reg. Sec. 1.413(c)(3)-1. We treat each requirement in order.
 
 
 32
 Not surprisingly, the Commissioner concedes that the plans in question all satisfied the section 415(b) limitations.[8] Each plan limited its benefits to well within the applicable section 415 limits. Under these circumstances, as the Tax Court concluded, there can be no question that the disputed contributions were deductible so far as section 404(j)(1) was concerned. See Citrus Valley Estates, 99 T.C. at 448. We so hold.
 
 
 33
 We turn to the requirement that plan costs be properly computed. In calculating plan costs, taxpayers must make a reasonable allocation of plan benefits between past and future years. See Income Tax Reg. Sec. 1.412(c)(3)-1(e)(3) (articulating rule for career average pay plans). We hold that each of the disputed plans made a reasonable allocation. In each case, the plans allocated to normal cost the entire amount of benefits that accrued each year, relying on Treas.Reg. Sec. 1.412(c)(3)-1(b)(2)(ii) (1980), which defines normal cost under a reasonable funding method as "[a]n amount equal to the present value of benefits accruing under the method for a particular plan year." The plans did not allocate anything to past service cost, because, as the Commissioner concedes, none of the plans provided for past service liability. Under these circumstances, the taxpayers in each of the disputed plans were entitled to an immediate deduction for the entire amount of normal cost. Code Sec. 404(a)(1)(A)(iii).
 
 
 34
 Our reasoning admittedly departs from the Seventh Circuit's decision in Jerome Mirza & Assocs. v. United States, 882 F.2d 229 (7th Cir.1989) (holding that Sec. 415(b) limits must be taken into account in allocating plan benefits between normal cost and past service liability). We agree with the Tax Court, however, that Jerome Mirza was incorrectly decided. See Citrus Valley Estates, 99 T.C. at 450. There is no express link between the section 415(b) limitations and the allocation requirement of Income Tax Reg. Sec. 1.412(c)(3)-1(e)(3). Nor is there any good reason to create one. When used in connection with a career average pay plan, the unit credit funding method automatically makes a reasonable allocation between past and future years of service. As the Tax Court concluded, the present value of accrued benefits in a career average pay plan, by definition, relates directly to the year in which the benefits were accrued. See Citrus Valley Estates, 99 T.C. at 450-51.
 
 
 35
 Congress must have recognized that the law it enacted plainly gave plan sponsors the opportunity to avoid a lengthy amortization of past service liability. All plan sponsors had to do to avoid amortization was to refuse to give credit for past service. See Code Sec. 404(a)(1)(A)(iii). Like the Tax Court, we believe that Congress was focusing on large corporate plans rather than small plans when it enacted these provisions. See Citrus Valley Estates, 99 T.C. at 450 n. 13 (remarking that it would be a deterrent to adopting any plan at all if large corporations immediately had to fund past service liability).
 
 
 36
 Despite the suggestion of the Jerome Mirza court, giving plan sponsors the benefit of the Code's plain language does not effectively eliminate the requirement that past service costs be amortized over ten years. See Jerome Mirza, 882 F.2d at 232 (citing Sec. 404(a)(1)(A)(iii)). If an IDB plan provides for past service liability, the plan must, in accordance with section 404(a)(1)(A)(iii), amortize over ten years the cost of funding the past service liability. We merely hold today that an IDB plan that does not assume past service liability may, consistent with the unit credit funding method, allocate to normal cost the entire amount of benefits that accrue in a particular plan year and take an immediate deduction under section 404(a).
 
 
 37
 Finally, we note that the type of large, up-front funding that occurred in these cases is not possible for plan years beginning after December 31, 1986. In the Tax Reform Act of 1986, Congress amended section 415(b)(5) so that for plan years beginning after December 31, 1986, the section 415(b)(1) dollar limitation is phased in over the first 10 years of participation in the plan rather than 10 years of service with the plan sponsor. See Pub.L. 99-514, Sec. 1106(f), 100 Stat. 2085, 2424 (1986).
 
 CONCLUSION
 
 38
 The decisions in Citrus Valley Estates, Inc. v. Commissioner, No. 93-70846, Citrus Valley Estates, Inc. v. Commissioner, No. 93-70847, Davis v. Commissioner, No. 93-70488, Old Frontier Investments, Inc. v. Commissioner, No. 93-70491, Robert Stephan, Jr., P.C. v. Commissioner, No. 93-70492, Boren Steel Consultants v. Commissioner, No. 93-70493, Boren Steel Consultants v. Commissioner, No. 93-70494, Arizona Orthopedic Institute of Traumatic and Reconstructive Surgery, P.C., v. Commissioner, No. 93-70498, and Fox v. Commissioner, No. 93-70499, are AFFIRMED.
 
 
 39
 The decisions in Lear Eye Clinic, Ltd. v. Commissioner, No. 93-70495, Lear Eye Clinic, Ltd. v. Commissioner, No. 93-70496, and Brody Enterprises, Inc. v. Commissioner, No. 93-70500, are REMANDED with instructions to determine whether the plan participants properly counted their previous employment towards the section 415(b) maximum benefit limitations.
 
 
 
 *
 The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation
 
 
 [1]
 Unless otherwise noted, all references to the Code are to those provisions in effect at the time of the disputed plan years
 
 
 [2]
 The challenged assumptions included a 5 percent interest rate assumption (all plans), an age 55 retirement assumption (the Davis, Stephan, Lear, Fox, and Brody Enterprises plans), certain mortality assumptions (the Citrus Valley, Fox, and Brody Enterprises plans), and certain pre-retirement expense load assumptions (the Brody Enterprises plan)
 
 
 [3]
 Plan actuaries must be enrolled by the Joint Board for the Enrollment of Actuaries, which was created by ERISA to set standards and qualifications for professionals performing actuarial services for ERISA-covered plans. See Code Sec. 7701(a)(35) (1988); Citrus Valley Estates, 99 T.C. at 403-04 (describing regulation of the actuarial profession)
 
 
 [4]
 We also reject the Commissioner's argument that Boren Steel v. Commissioner, 49 F.3d 1410 (9th Cir.1995), should be remanded to the Tax Court for a recalculation of the excise tax the Commissioner claims is owed under Code Sec. 4972. The Tax Court did not err in holding that the actuarial assumptions employed in the Boren Steel plan were reasonable in the aggregate and represented the actuary's best estimate of anticipated plan experience. Therefore, there is no basis for a recalculation of the excise tax
 
 
 [5]
 At two points, the Tax Court noted that it was not "entirely convinced" that certain of the Taxpayers' mortality assumptions were "completely reasonable." Citrus Valley Estates, 99 T.C. at 438, 439 (addressing Citrus Valley and Brody Enterprises plans). However, the Tax Court found that even with the dubious mortality estimates, Taxpayers' assumptions were reasonable in the aggregate. Id. This, of course, is precisely what the statute requires. See Code Secs. 404(a)(1)(A), 412(c)(3). The Tax Court's alternative holding that the mortality assumptions were not "substantially unreasonable" therefore did not affect the outcome of the case
 
 
 [6]
 The Commissioner advances this argument in the Davis, Stephan, Lear Eye Clinic, Arizona Orthopedic Institute, and Brody Enterprises cases
 
 
 [7]
 The unit credit funding method requires IDB plan sponsors to make annual contributions in an amount sufficient to fund the benefits that accrue in a particular plan year. In each of the cases before us, plan participants accrued benefits according to specified percentages of their annual compensation. These types of IDB plans often are referred to as career average pay plans
 
 
 [8]
 Except, of course, the plans in the Brody Enterprises and Lear Eye Clinic cases