FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

OCT 28 2022

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| GCIU-EMPLOYER RETIREMENT FUND; BOARD OF TRUSTEES OF THE GCIU-EMPLOYER RETIREMENT FUND,<br><br>  Plaintiffs-Appellants/Cross-Appellees,<br><br> v.<br><br>MNG ENTERPRISES, INC., DBA Digital First Media,<br><br>  Defendant-Appellee/Cross-Appellant. | Nos.  21-55864<br>    21-55923<br><br>D.C. No.<br>2:21-cv-00061-PA-JEM<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted August 29, 2022
Pasadena, California

Before:  Milan D. Smith, Jr. and Ryan D. Nelson, Circuit Judges, and Gershwin A. Drain,[*] District Judge.

Opinion by Judge R. Nelson

---

  [*]    The Honorable Gershwin A. Drain, United States District Judge for the Eastern District of Michigan, sitting by designation.

# SUMMARY[**]

## Multiemployer Pension Plan Amendments Act

The panel affirmed in part and vacated in part the district court's order affirming, except for a typographical error, an arbitrator's award regarding the withdrawal liability, under the Multiemployer Pension Plan Amendments Act of 1980, of MNG Enterprises, following MNG's complete withdrawal from GCIU-Employer Retirement Fund, a multiemployer pension plan.

GCIU's actuary calculated MNG's withdrawal liability using an interest rate published by the Pension Benefit Guaranty Corporation (PBGC). The actuary also accounted for the contribution histories of two newspapers that MNG had acquired several years before its complete withdrawal. On MNG's challenge, the arbitrator found (1) that MNG could not be assessed partial withdrawal liability following a complete withdrawal, (2) that it had shown the interest rate used was not the best estimate of the plan's experience, and (3) that GCIU properly considered the newspapers' contribution histories because MNG was a successor to them.

Under the MPPAA, withdrawal liability covers the employer's proportionate share of the plan's unfunded vested benefits, calculated as the difference between the present value of the vested benefits and the current value of the plan's assets. When an employer sells its assets and withdraws from the pension plan, it ordinarily incurs liability for a complete withdrawal. The obligation to pay that liability usually remains with the selling employer, but courts have equitable discretion to hold the purchaser responsible. If a dispute arises as to the amount of withdrawal liability, arbitration is required.

MNG included two smaller controlled groups, MediaNews Group and California Newspaper Partnership Controlled Group. In 2013, California Newspaper completely withdrew from GCIU. In 2014, MediaNews did the same, ending MNG's contributions to GCIU. In 2018, GCIU assessed against MediaNews a 2014 complete withdrawal and two subsequent partial withdrawals for 2014 and 2015. In 2006 and 2007, MediaNews and California Newspaper had acquired the assets of

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

two newspapers, the *Torrance Daily Breeze* and the *Santa Cruz Sentinel*, which had participated in GCIU but stopped contributing before MNG acquired them. Nothing in the record suggested that GCIU assessed withdrawal liability against the newspapers when they withdrew.

Affirming in part, the panel held that, under the unambiguous text of the MPPAA, a partial withdrawal cannot occur after a complete withdrawal when the employer has not otherwise resumed operations or contributions. Thus, GCIU could not assess MNG for two partial withdrawals following its complete withdrawal.

The panel held that the MPPAA directs the plan actuary to determine withdrawal liability based on "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." The panel held that the GCIU actuary's use of the PBGC rate, without considering the "experience of the plan and reasonable expectations," did not satisfy the "best estimate" standard.

Vacating in part as to the inclusion of the newspapers' contribution histories, the panel held that if a purchaser is a successor and has notice of the withdrawal liability, then a court may use its equitable discretion to hold the purchaser liable. The district court concluded that MediaNews and California Newspaper were successors to the *Daily Breeze* and the *Sentinel* and that both had notice of the potential liability. The panel held that the district court abused its discretion by not considering MNG's possible successor liability as of the asset sale dates in 2006 and 2007. The panel vacated and remanded for the district court to determine in the first instance whether MNG had successor liability and if GCIU correctly applied the newspapers' contribution histories at the time of the asset sales.

---

## COUNSEL

---

Michael J. Korda (argued), George M. Kraw, Katherine A. McDonough, Kraw Law Group, Mountain View, California; Valentina Mindirgasova, Kraw Law Group, Escondido, California; for Plaintiffs-Appellants.

James E. Tysse (argued) and Eric D. Field, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C.; Michael J. Weisbuch, Akin Gump Strauss Hauer & Feld LLP, San Francisco, California; for Defendant-Appellee.

R. NELSON, Circuit Judge:

The Multiemployer Pension Plan Amendments Act of 1980 imposes liability on employers who withdraw—partially or completely—from multiemployer pension funds. That liability assessment is based on "the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1). After a complete withdrawal, GCIU-Employer Retirement Fund's (GCIU) actuary calculated MNG Enterprise's (MNG) withdrawal liability using an interest rate published by the Pension Benefit Guaranty Corporation. The actuary also accounted for the contribution histories of two newspapers that MNG had acquired several years before its complete withdrawal.

On MNG's challenge, an arbitrator found (1) that MNG could not be assessed partial withdrawal liability following a complete withdrawal, (2) that it had shown the interest rate used was not the best estimate of the plan's experience, and (3) that GCIU properly included the newspapers' contribution histories. The district court affirmed the arbitrator's award, vacating and correcting only a typographical error on the interest rate. We partially affirm, partially vacate, and remand for the district court to decide whether successor liability would apply to MNG at the time of the asset sales.

1

I

A

Congress enacted the Employee Retirement Income Security Act of 1974 (ERISA) to ensure that pensions maintain sufficient funding to pay pensioners' benefits. 29 U.S.C. § 1001(a). ERISA's minimum funding standards require employers to contribute enough assets to pension plans to cover future liabilities. *See* 26 U.S.C. § 412(a). ERISA also provides for withdrawal liability. *See* 29 U.S.C. § 1364. Under the old rules, that liability did not kick in until the plan became insolvent—once it was insolvent, ERISA imposed liability on "any employer who had withdrawn from the plan during the previous five years" for their "fair share of the plan's underfunding." *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995).

Before the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), multiemployer pension plans faced special problems. For instance, employers participating in a multiemployer plan could withdraw without triggering the liability provisions. *See United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co.*, 39 F.4th 730, 734 (D.C. Cir. 2022). As employers withdrew, the fund's assets shrank; in turn, the remaining employers had to contribute more to meet the minimum funding standards. *Id.* at 734–35. This created a vicious cycle: as soon as a plan was at risk for underfunding, employers would withdraw and risk the

2

possibility of later liability rather than take on the certainty of increased contributions in the meantime. *Milwaukee Brewery*, 513 U.S. at 416–17.

The MPPAA aimed to solve these problems by imposing withdrawal liability on employers when they withdrew from the plan rather than up to five years down the road. 29 U.S.C. § 1381(a). And that liability would cover "the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of the vested benefits and the current value of the plan's assets." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 217 (1986); *see also* 29 U.S.C. §§ 1381(b), 1391. Both complete and partial withdrawals trigger withdrawal liability. *See* 29 U.S.C. § 1381(a), 1383, 1385.

Pension plans now have rules explaining "how to determine a plan's total underfunding" and "how to determine an employer's fair share" of that underfunding. *Milwaukee Brewery*, 513 U.S. at 417–18. The MPPAA gives the plan sponsor initial responsibility to determine an employer's withdrawal liability. 29 U.S.C. § 1382(1). The plan actuary must use "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." § 1393(a)(1). After determining the amount of liability, the plan must notify the employer "[a]s soon as practicable" and then collect the amount. §§ 1382(2)–(3), 1399(b)(1).

3

When an employer sells its assets and withdraws from the pension plan, it ordinarily incurs liability for a complete withdrawal. *See* §§ 1381(a), 1383(a), 1384(a). The obligation to pay that liability usually remains with the selling employer. *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Haw. Pension Plan*, 891 F.3d 839, 842 (9th Cir. 2018). Under common law, courts have equitable discretion to hold the purchaser responsible for that liability. *See Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1084 (9th Cir. 2015). The common-law rule creating successor liability applies when the purchaser is (1) a successor and (2) has notice of the liability. *Heavenly Hana*, 891 F.3d at 843 (citation omitted). Even so, as "the origins of successor liability are equitable," courts apply successor liability only "when it is fair to do so[.]" *Id.* at 847 (internal quotation marks omitted) (quoting *Resilient Floor*, 801 F.3d at 1091).

If a dispute arises as to the amount of withdrawal liability, ERISA and the MPPAA mandate arbitration. 29 U.S.C. § 1401(a). Any party may then appeal the arbitrator's award to the proper United States district court. § 1401(b)(2).

B

MNG, the named party in this appeal, includes two smaller controlled groups, MediaNews Group and California Newspaper Partnership Controlled Group. In 2013, California Newspaper completely withdrew from GCIU. In 2014,

4

MediaNews did the same, ending MNG's contributions to GCIU. In 2018, GCIU assessed against MediaNews a 2014 complete withdrawal and two subsequent partial withdrawals for 2014 and 2015.[1] The 2014 partial withdrawal liability totaled $8,650,737 and the 2015 partial withdrawal, $4,229,840.

Previously in 2006, MediaNews acquired the assets of the *Torrance Daily Breeze*. Meanwhile, in 2007, California Newspaper acquired the assets of the *Santa Cruz Sentinel*. Both newspapers previously participated in GCIU and stopped contributing before MNG acquired them. Nothing in the record suggests that GCIU assessed withdrawal liability against the *Daily Breeze* or the *Sentinel* when they withdrew.

In calculating MNG's withdrawal liability, the plan actuary used the Pension Benefit Guaranty Corporation's (PBGC) published rate, which was around 4%. The actuary testified that the PBGC rate is based on a settlement-type obligation and does not account for the future experience of the plan. Generally, using the PBGC rate results in a higher amount of withdrawal liability because it assumes a lower rate of growth. The actuary also included the contribution histories of the *Daily Breeze* and the *Sentinel* in calculating liability.

MNG contested the 2014 and 2015 partial withdrawals, the use of the PBGC

---

[1] GCIU also assessed partial withdrawal liability against MediaNews for 2012 and 2013, but those withdrawals are not in dispute.

interest rate, and the inclusion of the newspapers' contribution histories. The parties proceeded to arbitration.

The arbitrator first found that MNG could not be liable for the partial withdrawals that occurred after it completely withdrew from GCIU. He reasoned that no partial withdrawals could occur following a complete withdrawal and that MNG had completely withdrawn by the reported dates of the partial withdrawals. Next, the arbitrator found that MNG had shown that the actuary relied on unreasonable assumptions in deciding the interest rate for the withdrawal liability because the PBGC rate disregarded the experience of the plan and the expected returns on assets. He instead directed GCIU to recalculate liability with a 7% interest rate. Finally, the arbitrator held that GCIU properly included the contribution histories of the newspapers acquired by MNG because MNG was a successor that had notice of the liabilities.

Both parties sought judicial review. The district court affirmed the award, except with respect to the interest rate. Instead of the arbitrator's 7% interest rate, the district court ordered an 8% interest rate because it believed the arbitrator made a typographical error. On appeal, GCIU contends that the district court erred in affirming the arbitrator's award as to partial-withdrawal liability and the PBGC interest rate. MNG would have us affirm the district court on those issues but asks us to reverse the inclusion of the newspapers' contribution histories.

## II

Title 29, section 1401(b)(2) authorizes judicial review to "enforce, vacate, or modify the arbitrator's award" in an MPPAA dispute. *See Trs. of Amalgamated Ins. Fund v. Geltman Indus., Inc.*, 784 F.2d 926, 928 (9th Cir. 1986). We presume that "findings of fact made by the arbitrator were correct," unless rebutted "by a clear preponderance of the evidence." § 1401(c). We review conclusions of law de novo, *Geltman Indus.*, 784 F.2d at 928–29, and applications of equitable relief for abuse of discretion, *Metal Jeans, Inc. v. Metal Sport, Inc.*, 987 F.3d 1242, 1244 (9th Cir. 2021). The standard of review for MPPAA arbitrations is notably less deferential than under the Federal Arbitration Act. *See Bd. of Trs. of the W. States Off. & Pro. Emps. Pension Fund v. Welfare & Pension Admin. Serv., Inc.*, 24 F.4th 1278, 1283 n.4 (9th Cir. 2022); *Cent. States, Se. & Sw. Areas Pension Fund v. Nitehawk Exp., Inc.*, 223 F.3d 483, 488 n.2 (7th Cir. 2000).

## III

### A

The MPPAA defines two types of withdrawals, complete and partial. A complete withdrawal occurs when an employer "permanently ceases to have an obligation to contribute under the plan," § 1383(a)(1), or when the employer "permanently ceases all covered operations under the plan," § 1383(a)(2). A partial withdrawal occurs when there is "a 70-percent contribution decline" or "a partial

cessation of the employer's contribution obligation." § 1385(a). Section 1385 also specifies that a partial withdrawal will be treated as occurring "on the last day of a plan year." *Id.* The MPPAA provides a formula for calculating the 70-percent contribution decline that depends on the employer's contributions in the past 8 years. *See* § 1385(b)(1).

MNG contends that a partial withdrawal cannot occur after a complete withdrawal. We agree.

When interpreting statutes, the court "give[s] effect to the unambiguous words Congress actually used." *GCIU-Emp. Ret. Fund v. Quad/Graphics, Inc.*, 909 F.3d 1214, 1218 (9th Cir. 2018) (quotation omitted). Whether the language is plain depends on context and the overall statutory scheme. *King v. Burwell*, 576 U.S. 473, 486 (2015).

As with all statutory interpretation questions, "[w]e begin with the statutory text, and end there as well if the text is unambiguous." *Connell v. Lima Corp.*, 988 F.3d 1089, 1097 (9th Cir. 2021) (cleaned up). The MPPAA is unambiguous that neither of the two forms of partial withdrawal could follow a complete withdrawal. First, a "70-percent contribution decline" would always follow a complete withdrawal, rendering the distinction between complete and partial withdrawal meaningless. And we presume that Congress did not intend any part of the statute to be "superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31

8

(2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) (cleaned up). Specifying two types of withdrawal would hardly make sense if a partial withdrawal always followed a complete one.

So too for the second form of partial withdrawal. There cannot be "a partial cessation of the employer's contribution obligation" following a complete withdrawal. § 1385(a)(2). This is because the statute defines a complete withdrawal as a "permanent[ ]" cessation (1) of any obligation to contribute or (2) of all covered operations under the plan. § 1383(a). One cannot partially cease something after completely ceasing it. *See Cent. States, Se. & Sw. Areas Pension Fund v. Robinson Cartage Co.*, 55 F.3d 1318, 1321 n.1 (7th Cir. 1995) ("Partial withdrawal occurs when a contributing employer has not completely withdrawn from the Fund but has undergone a long term reduction in its contribution base.").

Moreover, dictionary definitions highlight the difference between "partial" and "complete." Black's Law Dictionary contrasts "partial" with complete: it defines "partial" as "[n]ot complete; of, relating to, or involving only a part rather than the whole." *Partial*, *Black's Law Dictionary* (11th ed. 2019). It follows then that a partial withdrawal cannot follow a complete one as nothing is left to be withdrawn after the whole is removed.

Neighboring provisions also bolster our interpretation. Section 1386 provides that if an employer incurs partial withdrawal liability in one year, "any withdrawal

9

liability of that employer for a partial or complete withdrawal from that plan in a subsequent plan year shall be reduced by the amount of any partial withdrawal liability" from the previous year. 29 U.S.C. § 1386(b)(1). This contemplates a partial withdrawal followed by either a partial or complete withdrawal. Turning to § 1387, which provides for reduction of complete withdrawal liability, the two subsections cover only the scenario in which an employer completely withdraws and then "subsequently resumes covered operations" or "renews an obligation to contribute[.]" 29 U.S.C. § 1387. Unlike § 1386, § 1387 does not provide that partial withdrawal liability following a complete withdrawal would be reduced by the earlier complete withdrawal. That partial withdrawals cannot follow a complete withdrawal explains the difference between these sections.

The statutory text and context support our plain textual reading that a partial withdrawal cannot follow a complete withdrawal when the employer has not otherwise resumed operations or contributions. Thus, GCIU could not assess MNG for two partial withdrawals following its complete withdrawal.

B

The parties also dispute the actuary's interest rate assumption. The MPPAA directs the plan actuary to determine withdrawal liability based on "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in

10

combination, offer the actuary's best estimate of anticipated experience under the plan." § 1393(a)(1).[2] These actuarial assumptions approximate factors such as the "mortality of covered employees, likelihood of benefits vesting, and importantly future interest rates." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 610 (1993). The plan's actuary uses these assumptions to compare the projected future payouts with the expected performance and determine the unfunded benefits. *Id.*

Within this calculation, the interest rate assumption is "arguably the most important." *Id.* at 633; *see also United Mine Workers*, 39 F.4th at 738–39. A higher interest rate yields a higher projected growth, meaning "the fund will not need as many assets today to pay liabilities in the future." *Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund*, 15 F.4th 407, 419 (6th Cir. 2021). On the

---

[2] Section 1393(a)(2) permits the actuary to use "actuarial assumptions and methods set forth in the corporation's regulations," but neither party argues that the PBGC (i.e., "the corporation") had any applicable regulations in place when this dispute arose. GCIU does, however, argue that the court should consider a recently proposed PBGC regulation as persuasive authority. *See* Actuarial Assumptions for Determining an Employer's Withdrawal Liability, 87 Fed. Reg. 62316 (Oct. 14, 2022) (to be codified at 29 C.F.R. pt. 4213). That proposed regulation does not help GCIU here. While the regulation, if enacted, would permit plans to use the PBGC rate when calculating withdrawal liability, the regulation expressly invokes the PBGC's authority under subsection (a)(2) of § 1393 when doing so. Here, by contrast, GCIU must justify its actuary's assumptions under subsection (a)(1)— which, as indicated by the disjunctive "or" in that provision, is a separate path with separate requirements. The PBGC's proposed regulation, therefore, has no bearing on the question presented here; nor do we express any view on the validity of the proposed regulation.

other hand, a lower interest rate requires more assets to pay off future liabilities, which in turn increases the underfunding amount and the withdrawal liability. *Id.*

GCIU's actuary used the PBGC interest rate to determine MNG's withdrawal liability. He testified that GCIU did not "take into consideration the future experience of the GCIU fund" or its "expected returns on the plan's funds as currently invested." The arbitrator concluded that the use of the PBGC rate did not comply with ERISA's requirements, and the district court agreed. We follow our sister circuits and interpret the statute to require that the actuary's assumptions and methods reflect the plan's characteristics. *United Mine Workers*, 39 F.4th at 738; *Sofco Erectors*, 15 F.4th at 422–23.

Though the statute appears to build in some leeway—using the term, "reasonable"—it specifies that these assumptions and methods must "tak[e] into account the experience of the plan and reasonable expectations" and "in combination, offer the actuary's best estimate of anticipated experience under the plan." § 1393(a)(1). The "best estimate" language means that "the actuary must make assumptions based on the plan's particular characteristics when calculating withdrawal liability." *United Mine Workers*, 39 F.4th at 738. By ignoring the expected returns of the plan's assets and experience, the actuary's estimate fell short of the statutory "best estimate" standard because it was not tailored to the features of the plan. *See Sofco Erectors*, 15 F.4th at 421 ("While the actuary's true 'best

12

estimate' deserves deference, it must be his 'best estimate of anticipated experience under the plan.'").

GCIU would have us hold that the district court erred in not considering the interest rate combined with other factors. In its view, the statute only requires the actuary's assumptions to be reasonable "in the aggregate" and to offer the best estimate "in combination" with other assumptions. So GCIU contends that the interest rate does not need to individually account for the plan's unique characteristics so long as the combination of assumptions and methods produces the best estimate of the plan's anticipated experience.

But we cannot ignore the statutory language directing the actuary to offer "the best estimate of anticipated experience *under the plan*." § 1393(a)(1) (emphasis added). While actuaries may reasonably disagree as to the exact interest rate that best accounts for the plan's experience and anticipated returns, "the discount rate assumption cannot be divorced from the plan's anticipated investment returns." *United Mine Workers*, 39 F.4th at 740. GCIU's actuary testified that the PBGC rate ignores the expected returns on the plan's assets. Because that rate overlooks the plan's expected returns, it does not satisfy the "best estimate" standard.

Again, the statutory context supports our interpretation. When calculations need not account for plan experience, ERISA is clear. The minimum funding provision, for example, states that the interest rate "shall be . . . determined without

13

taking into account the experience of the plan." 29 U.S.C. § 1084(c)(6)(E)(iii)(I). This bolsters our interpretation that the "best estimate" language requires a more tailored interest rate. *See United Mine Workers*, 39 F.4th at 738 (presumption of meaningful variation).

Our decision accords with *Citrus Valley Estates, Inc. v. Commissioner*, 49 F.3d 1410, 1414 (9th Cir. 1995). There, the Commissioner of Internal Revenue appealed a Tax Court judgment holding that the actuary may conservatively estimate actuarial assumptions in hopes of increasing initial plan funding. *Id.* at 1413. In the Commissioner's view, "best estimate" required a neutral assessment and the actuary's use of a conservative estimate was not neutral. *Id.* at 1414. We disagreed with the Commissioner and explained that "[t]he 'best estimate' language is 'principally designed to ensure that the chosen assumptions actually represent the actuary's own judgment rather than the dictates of plan administrators or sponsors.'" *Id.* (citation omitted). But we did not reach whether a "best estimate" had to account for the specific characteristics of a plan because that issue was not presented. Indeed, the *Citrus Valley* actuary arguably *did* account for the plan's particular features in his calculations. *See id.* at 1413 (Tax Court noted that the plans were new and "lack[ed] credible experience," rendering conservative estimates more

14

appropriate).[3]

We accordingly hold that the actuary's use of the PBGC rate—without considering the "experience of the plan and reasonable expectations"—did not satisfy the "best estimate" standard.[4]

C

Finally, the parties dispute whether the newspapers' contribution histories should be included. When a participating employer sells its assets, any of its liabilities, including for withdrawals, generally remain with the employer. *See Heavenly Hana*, 891 F.3d at 842. If, however, the purchaser is (1) a successor and (2) has notice of the withdrawal liability, then a court may use its equitable discretion to hold the purchaser liable. *Resilient Floor Covering*, 801 F.3d at 1084. A district court abuses its discretion in awarding equitable relief where it "base[s] its ruling on an erroneous view of the law" or "on a factual finding that was 'illogical, implausible, or without support in inferences that may be drawn from the record.'" *Teutscher v. Woodson*, 835 F.3d 936, 942 (9th Cir. 2016) (quoting *United States v.*

---

[3] In its reply, GCIU argues for the first time that the district court erred in fixing the typographical error increasing the interest rate from 7% to 8%. "The court 'will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief.'" *Clark v. Time Warner Cable*, 523 F.3d 1110, 1116 (9th Cir. 2008) (quoting *Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998)). Because GCIU failed to raise this argument earlier, we do not consider it.

[4] We express no view on an actuary's use of the PBGC rate as a starting point or a component in a blended rate.

15

*Hinkson*, 585 F.3d 1247, 1262–63 (9th Cir. 2009) (en banc)).

MNG argues that the contribution histories of the *Daily Breeze* and the *Sentinel* should not have been included in calculating its withdrawal liability. GCIU assessed liability in 2018 for MNG's own withdrawals from the fund in 2013 and 2014. MNG acquired these newspapers more than a decade earlier in 2006 and 2007. The district court concluded MediaNews and California Newspaper were successors to the *Daily Breeze* and the *Sentinel*, respectively, and that both had notice of the potential liability.

We hold that the district court abused its discretion by not considering successor liability as of the asset sale dates in 2006 and 2007 and whether "it is fair" to impose this liability as of 2018. *Heavenly Hana*, 891 F.3d at 847. The record does not reflect whether GCIU determined MNG's liability with respect to the newspapers based on the total contribution as of MNG's complete withdrawal in 2014 or if GCIU determined that portion of liability based on the status of the asset sale dates in 2006 and 2007. Any withdrawal liability that the *Daily Breeze* or the *Sentinel* incurred would have existed at the time of the withdrawals, which occurred in 2006 and 2007. *See id.* at 843 ("The existence of unfunded vested benefit liabilities on the day of [employer's] withdrawal resulted in withdrawal liability for [employer] under the Act."). The date of those asset sales in 2006 and 2007, rather than 2014 when MNG completely withdrew, is the relevant date to determine

whether MNG was a successor and whether the contribution histories should be equitably included. The district court must also consider whether "fairness could militate against imposing successor liability" because this doctrine sounds in equity. *Resilient Floor*, 801 F.3d at 1091.

In reaching this conclusion, we express no opinion on whether successor liability should apply. We hold only that the asset sale dates in 2006 and 2007 are the relevant time periods to determine any liability and whether to include the contribution histories. We thus vacate and remand for the district court to determine in the first instance whether MNG has successor liability and if GCIU correctly applied the newspapers' contribution histories at the time of the asset sales.

IV

The district court correctly held that GCIU improperly assessed liability for partial withdrawals after MNG completely withdrew and that GCIU erred in using the PBGC rate. But the district court should have considered the applicability of successor liability, including contribution histories, at the time of the asset sales. We vacate and remand for consideration of that question.

**AFFIRMED IN PART; VACATED IN PART; AND REMANDED.**

17